## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

Robert B.,

       Plaintiff,

     v.

Andrew Saul,
*Commissioner of Social Security,*

       Defendant.

Case No. 20-cv-00424 MSK[1]/DTS

**OPINION AND ORDER
REVERSING AND REMANDING THE
COMMISSIONER'S DECISION**

---

Meredith Marcus, 4256 N. Ravenswood Ave., Suite 104, Chicago, IL,
counsel for Plaintiff.

Kizuwanda Curtis, Special Assistant United States Attorney,
United States Attorney's Office, counsel for Defendant.

---

**THIS MATTER** comes before the Court on the Plaintiff's Complaint **(#1)** seeking

judicial review of the final decision of the Commissioner of Social Security ("the

Commissioner") denying his application for disability insurance benefits under Title II of the

Social Security Act based on the parties' cross-motions for summary judgment pursuant to Local

Rule. *See* D. Minn. LR 7.2.[2]; **(#16, #17, #18, #19)**.   Plaintiff filed a reply in support of his

---

[1]     The Honorable Marcia S. Krieger from the District of Colorado sits by designation.

[2]     D. Minn. LR 7.2(c)(1) "Procedures in Social Security Cases" provides in part: "[w]ithin 60 days after the Commissioner of Social Security serves the answer and administrative record, the plaintiff must file and serve a summary-judgment motion and a supporting memorandum. Within 45 days after the plaintiff serves its summary-judgment motion, the Commissioner must file and serve a summary-judgment motion and a supporting memorandum. Within 14 days after the Commissioner serves its summary judgment motion, the plaintiff may file and serve a reply

motion. **(#26)**   For the following reasons, the Court grants Plaintiff's motion for summary

judgment **(#16)** and denies Defendant's motion for summary judgment **(#18)**.   The

Commissioner's decision is reversed, and the matter is remanded for further proceedings.

## I.   JURISDICTION

The Court has jurisdiction over an appeal from a final decision of the Commissioner

under 42 U.S.C. § 405(g).

## II.   BACKGROUND

**A.   Procedural History**

On March 31, 2016, Robert B. ("Mr. B"), filed an application for disability insurance

benefits under the Social Security Act, alleging disability since October 14, 2015.   **(#13 at 32)**.

On initial review, the Social Security Administration ("SSA") denied Mr. B's application finding

him not disabled.   **(#13 at 142-156)**.   Mr. B requested reconsideration, and again the SSA

denied his claim.   **(#13 at 174-187)**.

Mr. B made a written request for a hearing before an Administrative Law Judge ("ALJ"),

which was conducted on April 2, 2019 in Minneapolis, MN.   **(#13 at 74)**.   At the hearing, Mr.

B amended his alleged date of onset of disability to May 1, 2017.   **(#13 at 32, 139-140)**.   Based

on the evidence in the record, the ALJ issued a decision that was unfavorable decision to Mr. B

on April 16, 2019 ("Decision").   **(#13 at 29)**.   Mr. B appealed the Decision to the Appeals

Council asserting it was not supported by substantial evidence.   **(#13 at 379)**.   On November

15, 2019, the Appeals Counsel denied his Request for Review.   **(#13 at 5-11)**.

---

memorandum."

Mr. B now appeals the final agency action to this Court.   *See Davidson v. Astrue,* 501 F.3d 987, 989 (8th Cir. 2007) (stating that when the Appeals Council denies further review, the ALJ's decision is deemed the final decision of the Commissioner).

**B.    Pertinent Factual Background**

The Court offers a summary of the facts here and elaborates as necessary in its discussion.   Also, because the dispositive issue in this appeal concerns the weight given to a treating physician's opinion as to Mr. B's impairments, the Court summarizes only the medical evidence relevant to its decision.

At the time of his amended, alleged onset of disability, Mr. B was 49 years old. **(#13 at 57)**.   Mr. B was previously employed as an attorney for Best Buy.   **(#13 at 56-57, 78)**.   In October 2015, Mr. B left his job at Best Buy due to the exacerbation of symptoms caused by Multiple Sclerosis ("MS"). **(#13 at 82-84)**.   Since that time, he has received long term disability payments.   **(#17 at 4)**.

Mr. B suffers from MS, a "potentially disabling disease of the brain and spinal cord (central nervous system).   In MS, the immune system attacks the protective sheath (myelin) that covers nerve fibers and causes communication problems between your brain and the rest of your body.   Eventually, the disease can cause permanent damage or deterioration of the nerves." https://www.mayoclinic.org/diseases-conditions/multiple-sclerosis/symptoms-causes/syc-20350269.

Mr. B was first diagnosed with MS in 1991, at the age of 22, when he developed numbness, tingling, weakness, and partial paralysis to the left side of his body.   **(#13 at 382, 387, 389)**.   In 2012, his MS relapsed or flared, causing problems with his vision, balance and

increased tingling on his left side.   He was treated with a five-day course of intravenous

medications.  **(#13 at 387)**.   Medical records from 2014 characterized Mr. B's type of MS as

"relapsing/remitting" **(#13 at 389)**, which is a common disease course[3].

In May 2015, neurologist Syed Shahkhan, M.D., began treating Mr. B.   Mr. B reported

to Dr. Shahkhan that from 2012, he experienced some degree of cognitive impairment.   **(#13 at**

**415)**.   Dr. Shahkhan conducted a mental status exam and noted Mr. B had difficulty recalling

"serial 7s" and made two to three mistakes on this exercise.   **(#13 at 416)**.   Upon examination,

Dr. Shahkhan found Mr. B's physical deficits related to MS to include "significant cognitive

deficit considering his education level and his professional achievements."   **(#13 at 416)**.   Dr.

Shahkhan ordered MRI scans of the brain, cervical spine and thoracic spine and discussed

medication changes with Mr. B with the goal of decreasing the instance of MS relapses.   **(#13 at**

**416)**.   As to the brain, the MRI testing revealed "no change in the number of lesions" and "no

new active enhancing lesion" when compared to MRI results from 2013.   The MRI tests of the

cervical and thoracic spine showed non-active or inflamed "demyelinating-type lesions."   **(#13**

**at 414)**.   Dr. Shahkhan prescribed a new medication, Aubagio, and scheduled Mr. B for a follow

up appointment four months later.   **(#13 at 414)**.

In September 2015, Dr. Shahkhan again saw Mr. B for his MS.   Mr. B reported

---

[3]     This type of MS is "characterized by clearly defined attacks of new or increasing
neurologic symptoms. These attacks – also called relapses or exacerbations – are followed by
periods of partial or complete recovery (remissions). During remissions, all symptoms may
disappear, or some symptoms may continue and become permanent. However, there is no
apparent progression of the disease during the periods of remission."
https://www.nationalmssociety.org/What-is-MS/Types-of-MS.

increased difficulty performing his duties as an attorney for Best Buy.   Mr. B recalled that he was "making a number of errors at his work since 2013" and was "easily distracted", could not multitask, had difficulty concentrating, and could not complete his work on time.   Mr. B further stated that despite being given accommodations in 2013, he was unable to timely and accurately complete his work.   **(#13 at 412)**.   Dr. Shahkhan reviewed results from Mr. B's 2013 neuropsychological testing, which showed "cognitive deficits which do correlate with a demyelinating disease like multiple sclerosis."   The 2013 the testing showed Mr. B's "cognitive abilities are lower than expected", and his executive/attentional, learning/memory, and spatial abilities were mild or moderately low.   **(#13 at 412)**.   Also, his psychomotor abilities were mildly low on his left hand.   **(#13 at 412)**.   Dr. Shahkhan ordered updated neuropsychological testing, which was conducted on September 22, 2015 by neuropsychologist Kerri J. Lamberty, PhD.   **(#13 at 407)**.

During the testing session, Dr. Lamberty observed Mr. B to be mildly anxious.   Mr. B understood the task instructions but his response speed was "slower than average", and he tended to "underestimate his performance and was very hard on himself."   **(#13 at 408)**.   Mr. B put forth good effort on the tests but was "clearly upset with his performance."   **(#13 at 408)**.

Dr. Lamberty and one of her technicians administered the following comprehensive neuropsychological tests: (1) Wide Range Achievement Test-3 ("WRAT-3"), an oral sight reading test to establish a "reliable premorbid intellectual estimate"; (2) controlled oral word association test; (3) animal naming; (4) orientation; (5) mental control; (6) clinical interview; (7) word memory test; (8) trail making test; (9) Connors' Continuous Performance test; (10) Wechsler Adult Intelligence Scale-IV ("WAIS-IV"); (11) California Verbal Learning Test-11;

(12) Rey Osterrith Complex Figure Test; (13) Wisconsin Card Sorting Test; (14) Wechsler Memory Scale-IV Logical Memory and Visual Reproduction subtests; (15) Boston Naming Test; (16) Finger Tapping Test; (17) Grooved Pegboard Test; and (18) Minnesota Multiphasic Personality Inventory-2-RF.   **(#13 at 408)**.

Dr. Lamberty assessed Mr. B's performance on the tests as "variable".   As to his Intellectual/Academic function, his performance on the WRAT-IVs, which establishes a premorbid intellectual estimate, was "average".   Regarding the WAIS-IV, Mr. B's (i) performance was poor on tests requiring rapid responses; (ii) perceptual speed was significantly slowed; (iii) verbal skills were strong, and (iv) overall IQ was 99.   **(#13 at 408)**.

As to Orientation, Attention, and Mental Tracking, the tests showed Mr. B was "fully oriented and able to complete simple, rote tasks as well as more complex tasks requiring working memory."   **(#13 at 408)**.   Oral arithmetic skills were in the average to low average range and visual speed and sequencing were in the low average range.   Mr. B's divided attention and information processing speed were in the moderately impaired range.   **(#13 at 408)**.   Results of the visual attention test showed "very significant attention difficulties", and Mr. B "made a significant number of omission errors" and failed to respond to targets.   **(#13 at 408)**.   "His reaction time was extremely slow and variable" compared to the "normative group" and he had difficulty attending as the tasks progressed.   **(#13 at 408)**.   Dr. Lamberty characterized his performance as "slow and inaccurate", which is "generally a strong indicator of attention related deficits.   Even when responding very slowly, [Mr. B] was not able to increase his accuracy." **(#13 at 408-409)**.

As to his Executive Functioning results, Mr. B performed: (i) high average on a task

measuring verbal reasoning; (ii) average as to semantic fluency, nonverbal matrix reasoning, and visual spatial reasoning; (iii) average on a complex hypothesis task though he made more errors than average; and (iv) low average as to mental flexibility, problem solving, and phonemic fluency.   **(#13 at 409)**.   Also, Mr. B's memory and language scores were largely within normal limits.   **(#13 at 409-410)**.

Dr. Lamberty compared the 2015 testing results to previous test results and found a decline in some areas.   Specifically, attention and working memory appeared to be worse than when he was seen in 2013.   He also exhibited a decline in verbal skills, though his verbal skills were still in the high average to average range   **(#13 at 410)**.   In sum, Dr. Lamberty opined Mr. B could not work as an attorney because his "attention and processing speed are far too slow and his executive skills too impaired".   **(#13 at 410)**.   Dr. Lamberty recommended follow-up neuropsychological testing in 18 months.   Based on these test results, Dr. Shahkhan agreed Mr. B should go on long-term disability.   **(#13 at 406)**.

Mr. B continued treatment with Dr. Shahkhan in 2016.   In January, Dr. Shahkhan observed a change in Mr. B's physical condition – that he swayed on the Romberg test[4], had poor tandem walking[5], and a mild intention tremor on finger-to-nose testing.   Mr. B was otherwise noted to be in stable condition.   **(#13 at 405)**.   In April, Mr. B underwent additional

---

[4]      The Romberg test measures an individual's sense of balance.   "Specifically, the test assesses the function of the dorsal column in [the] spinal cord.   The dorsal column is responsible for proprioception, or [the] sense of [the]body's movement and position." https://www.healthline.com/health/romberg-test#What-is-Rombergs-test?

[5]      Tandem walking (heel to toe) means "[w]alking in a straight line with the front foot placed such that its heel touches the toe of the standing foot." https://www.ebmconsult.com/articles/tandem-gait-heel-to-toe

MRI testing.   The radiologist compared Mr. B's May 2015 brain MRI to the April 2016 brain MRI and found "stable mild to moderate supratentorial white matter change, compatible with multiple chronic demyelinating plaques; no suspicious enhancing lesions to suggest an active demyelinating process; and stable mild atrophy and mild T1 hypointense lesions load."   **(#13 at 421)**.   The May 2015 MRI indicated no "evidence for interval progression of disease."   **(#13 at 426)**.

Also in April 2016, upon Dr. Shahkhan's referral, Mr. B underwent occupational therapy functional testing.   **(#13 at 429-430)**.   The report recommended "skilled" physical therapy to address "reeducation to improve quality of movement with higher level balance activities, i.e. stair climbing, and strategies to optimize function following future MS exacerbations."   **(#13 at 429)**.   As to Mr. B's ability to walk, the functional report indicated Mr. B had "[a]mbulation demonstrated on this date with average pace, alternating L hip hike and abduction to compensate for hip flexion; L shoulder sloped with limited arm swing; decreased L foot dorsiflexion affecting swing through with gait …"   **(#13 at 430)**.   As to Mr. B's ability to climb stairs, the report noted Mr. B "demonstrated a reciprocal foot over foot ascent and descent of the stairs and he required mild use of the handrails.   During stair climbing he did present with safety issues while stair climbing due to decreased ankle dorsiflexion (toe up) positioning when ascending stairs. Limit repetition. Utilize handrails to optimize safety with activity."   **(#13 at 431)**.

In August 2016, Mr. B met with Dr. Shahkhan.   Consistent with observations at previous appointments, Dr. Shahkhan noted Mr. B swayed on a Romberg test, had poor tandem walking and a mild limp, and mild intention tremor on finger-to-nose testing.   **(#13 at 449)**.   In September 2016, Mr. B began physical therapy to address his limp, "gait deficits and

8

imbalance." **(#13 at 472-473)**.   The record reflects that between September and December 2016, Mr. B participated in nine physical therapy sessions.   **(#13 at 469-504)**.

In March 2017, upon Dr. Shahkhan's referral, Mr. B saw Dr. Lamberty again for updated neuropsychological testing.   The test results showed Mr. B's cognitive functioning had declined even further.   "He exhibited slow information processing speed and issues with attention." **(#13 at 520)**.   More specifically, Dr. Lamberty found Mr. B was "mildly impaired" and in the low average range for "simple visual sequencing, digit span and rapid color naming/word reading." **(#13 at 519)**.   She also assessed his (i) upper extremity fine motor/dexterity speed performance; (ii) immediate memory recall; and (iii) complex hypothesis testing to be in the low average range.   **(#13 at 519)**.   Also, as to phonemic fluency, Dr. Lamberty found Mr. B was in the "low average to mildly impaired range."   **(#13 at 519)**.   Dr. Lamberty opined that Mr. B could not return to his former position as an attorney.   She also indicated Mr. B's "information processing speed, poor attention and executive skills would contribute to significant issues in his position."   **(#13 at 520)**.   Dr. Lamberty further stated that "there has been a decline since his previous testing, and it is anticipated that he will continue to experience further cognitive issues in the long run."   **(#13 at 520)**.

Following the neuropsychological testing, in May 2017, Dr. Lamberty completed a "Behavioral Functional Ability" form for Mr. B and opined that his mental impairments precluded him from working.   **(#13 at 521)**.   As to the following work-related activities, Dr. Lamberty opined Mr. B has: (i) extreme limitations in the areas of "attaining precise [] units, tolerances, and standards", "performing under stress"; (ii) marked limitations in the areas of "directing, controlling, or planning the activities of others", "performing a wide variety of

duties", "expressing personal feelings," "making judgments and decisions", "influencing people

in their opinions, attitudes, and judgments"; and (iii) moderate limitations in the areas of

"performing repetitive or short cycle work", "working [] in physical isolation from others",

"working under specific instructions", "dealing with people", and attending work "consistently".

(**#13 at 521-523**).   Dr. Lamberty also opined that because Mr. B "has demonstrated significant

declines in cognitive abilities in the past 18 months (since his previous evaluation in Sept. 2015)"

and his "MS is progressive and these issues will likely continues to worsen over time", he was

"not currently able to work for any period of time." (**#13 at 523**).

In April 2017, Mr. B met with Dr. Shahkhan.   Based on the reported "decline in [Mr.

B's] memory", Dr. Shahkhan ordered another MRI to compare with the MRI done in April 2016.

(**#13 at 528**).   The April 2017 MRI showed "mild atrophy…stable mild to moderate scattered

foci of non-enhancing increased T2 signal within the periventricular and subcortical white matter

of both cerebral hemispheres."   (**#13 at 528**).

Mr. B saw Dr. Shahkhan again in March 2018. (**#13 at 529**).   Mr. B reported

experiencing leg aches as if he had "done 75 miles on a bicycle" that are "helped by walking."

(**#13 at 529**).   Dr. Shahkhan observed Mr. B was dragging his left leg more than at previous

visits.   Thus, based on Mr. B's increased symptoms of leg pain and problems with balance, Dr,

Shahkhan ordered another MRI, which occurred on March 30, 2018.   (**#13 at 529, 542**).   The

brain MRI report indicated "[c]ompared to the previous exam, again seen are multiple T2/

FLAIR signal hyperintense lesions within the periventricular, septal callosal and juxta cortical

white matter both cerebral hemispheres white matter compatible with demyelinating plaques of

multiple sclerosis."   (**#13 at 542**).   "No new white matter lesions.   Total number white-matter

lesions is greater than 10."   **(#13 at 542)**.

In September 2018, Mr. B returned to see Dr. Shahkhan and reported worsening of his symptoms then including fatigue, increased sweating, and more tingling in hands and toes.   **(#13 at 584)**.   Upon examination, Dr. Shahkhan noted little change to Mr. B's physical condition except for "mild difficulty with walking" as he appeared to drag his left leg "a little bit more compared to the previous exam."   **(#13 at 584)**.   Based on Mr. B's complaints, Dr. Shahkhan ordered updated MRI tests.   **(#13 at 584)**.   Thus, on September 26, 2018, Mr. B underwent yet another MRI of his brain.   **(#13 at 586)**.   Notably, this MRI showed "mild to moderate scattered foci of non-enhancing increased T2 signal within the periventricular and subcortical white matter of both cerebral hemispheres" and "development of a new 12 millimeter [brain] lesion".   **(#13 at 586, 588)**.

## C.    The ALJ's Decision

"The Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability."   *Locher v. Sullivan*, 968 F.2d 725, 727 (8th Cir. 1992).   An individual is eligible for Disability Insurance Benefits ("DIB")s under the Act if he or she is insured, has not attained retirement age, has filed an application for DIB, and is under a disability as defined in the Act.   42 U.S.C. § 423(a)(1).   An individual is determined to be under a disability only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his [or her] previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy …."   42 U.S.C. § 423(d)(2)(A).

On April 16, 2019, the ALJ issued a Decision unfavorable to Mr. B.   Using the

conventional multi-step analytical tool, the ALJ found at step one that Mr. B had not engaged in substantial gainful activity since May 1, 2017, the amended alleged onset date.  **(#13 at 34)**.   At step two, the ALJ found Mr. B had the following severe impairments: MS, MS-related cognitive disorder, and degenerative disc disease.  **(#13 at 34)**.

At step three, the ALJ found Mr. B did not have an impairment that met or medically equaled the presumptively disabling conditions listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  **(#13 at 35-42)**.   In making this finding, the ALJ considered Mr. B's mental impairments, finding he had (i) moderate limitations in the activities of "concentrating, persisting, or maintaining pace"; (ii) mild limitations in the activities of "adapting or managing oneself" and "understanding, remembering, or applying information"; and (iii) no limitations as to "interacting with others".[6]  **(#13 at 35-41)**.

The ALJ then assessed Mr. B's RFC and determined that he:

> has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) except: the claimant may never climb ropes, ladders, or scaffolds; and may occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl.   The claimant may have no exposure to extreme heat, unprotected heights, or hazards.   The claimant is limited to simple routine tasks.

**(#13 at 42)**.   In crafting Mr. B's RFC, the ALJ gave "great weight" to one portion of Dr.

---

[6]     The ALJ's analysis followed the process for evaluating mental impairments, and the categories of such impairments, as prescribed by the Commissioner's regulations.   These include the "psychiatric review technique," or "PRT," and the so-called "paragraph B" and "paragraph C" criteria for describing adult mental disorders.  *See generally* 20 C.F.R. §§ 404.1520a(c)–(d); *see also* Social Security Ruling 96-8P, 1996 WL 374184, at *4 (July 2, 1996). The regulations identify four functional areas in which the ALJ will rate the degree of a claimant's functional limitations, including: (1) the ability to understand, remember or apply information; (2) the ability to interact with others; (3) the ability to concentrate, persist, or maintain pace; and (4) the ability to adapt or manage oneself.   20 C.F.R. § 404.1520a(c)(3).

Lamberty's opinion and "no weight" to another portion. **(#13 at 46, 52-53)**.   At step four, the ALJ found Mr. B unable to perform his past relevant work as an attorney and thus proceeded to step five.   **(#13 at 56)**.   At step five, based on the testimony of the vocational expert ("VE"), the ALJ concluded that, considering Mr. B's age, education, work experience, and RFC, he could perform a reduced range of light, unskilled jobs in the national economy such as: deburrer, trimmer, and stuffer.   **(#13 at 57)**.

The ALJ therefore found Mr. B was not disabled as defined by the Social Security Act.

### III.    STANDARD OF REVIEW

In this Circuit, courts affirm the Commissioner's decision when it is supported by "substantial evidence on the record as a whole" and is free from legal error.   *Phillips v. Colvin*, 721 F.3d 623, 625 (8th Cir. 2013); *Byes v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012); *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010).   Substantial evidence means evidence that is "less than a preponderance but ... enough that a reasonable mind would find it adequate to support the conclusion."   *Id.*   In evaluating for substantial evidence, a court considers both the "evidence that supports the Commissioner's decision as well as the evidence that detracts from it."   *Id.* Although a reviewing court must meticulously examine the record, it may not weigh the evidence or substitute its discretion for that of the Commissioner.   *Id.*   In other words, if the record supports two inconsistent positions, and the Commissioner has adopted one of those positions, a court must affirm.   *Anderson v. Astrue,* 696 F.3d 790, 793 (8th Cir. 2012).

Thus, here, the question before the Court is whether there is substantial record evidence to support the ALJ's determination that Mr. B could perform unskilled, light work with certain limitations.

## IV.   DISCUSSION

Mr. B asserts several issues in his appeal.   First, he contends that the ALJ's Decision did not properly weigh the medical opinion evidence and failed to state valid reasons for rejecting treating physician Dr. Lamberty's 2017 RFC opinion.   Second, Mr. B asserts the ALJ erred in evaluating his subjective symptoms.   Third, Mr. B claims that the ALJ's Decision regarding the credibility of his wife's testimony was not supported by substantial evidence.   Fourth, Mr. B contends the RFC is not supported by substantial evidence.   Finally, Mr. B states that the new evidence submitted to the Appeals Counsel requires a remand.   **(#17)**.   Because the first argument is dispositive and requires remand, the Court will focus on it.

### A.   The ALJ's Evaluation of Dr. Lamberty's Opinion

A treating physician's opinion is generally entitled to controlling weight if it is "well supported by medically acceptable laboratory and diagnostic techniques and [not] inconsistent with the other substantial evidence in [the] case record."   *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006) (citing 20 C.F.R. § 404.1527(c)(2)).[7]   However, "[a]n ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions."   *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (internal quotations omitted).   When discounting the opinion of a treating physician, the ALJ must provide sound reasons to do so.   20 C.F.R. § 404.1527(d)(2).   For

---

[7]      Pursuant to a change in the Social Security Administration's regulations, effective March 27, 2017, treating physician opinions will no longer be given controlling weight.   However, the prior rule remains applicable to claims—like Mr. B's—filed before that date.   Rescission of Social Security Rulings 96–2P, 96–5P, and 06–3P, 2017 WL 3928298, at *1 (2017).

14

example, the ALJ may find that the treating physician has contradicted his or her own assessments elsewhere, or where other physicians' opinions are supported by superior medical evidence. *See id.*. When an ALJ summarily discounts an opinion from a treating physician, but the opinion is consistent with objective medical evidence, the ALJ erred in rejecting that opinion. *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir.2000).

However, even if a treating physician's opinion is not entitled to controlling weight, it is still entitled to deference, and pursuant to the SSA's regulations, the ALJ must consider: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion. *See* 20 C.F.R. § 404.1527. In applying these factors, the ALJ must make findings and reasoning sufficiently specific so the weight given to the medical source's opinion is clear to subsequent reviewers. *Id.*

Here, although the ALJ's Decision credited "great weight" to a portion of Dr. Lamberty's 2017 opinion, the Decision gave another portion of Dr. Lamberty's opinion "no weight." (**# 13 at 53**). In the Decision, the ALJ stated:

> Dr. Lamberty again indicated she does not feel the claimant would be able to return to his former position, noting information processing speed, poor attention and executive skills would contribute to significant issues in his position. She noted there had been a decline since previous testing, and it is anticipated that he would continue to experience further cognitive issues in the long-run. As with the

previous statement indicating the claimant could not perform work as an attorney, this statement is consistent with the record, generally accepted, and given great weight.

However, Dr. Lamberty completed another form indicating the claimant had demonstrated significant declines in cognitive abilities over the previous 18 months, and that give[n] that MS is a progressive disease, these issues would likely continue to worsen over time. She noted the claimant is not currently able to work for any period of time. This statement is conclusory and on an issue reserved to the Commissioner in these proceedings. Dr. Lamberty examined the claimant on two occasions, and her findings are not consistent with a compete inability to work, noting she has indicated generally mild cognitive decline with slow information processing speed and issues with attention, which are fully accommodated in the residual functional capacity above with limitations to simple routine tasks. Therefore, her statement indicating the claimant cannot perform any work is exceedingly restrictive and inconsistent with the evidence, and is given no weight as a result.

**(#13 at 53)**.

The Commissioner argues that the ALJ properly evaluated Dr. Lamberty's opinion and reasonably found it was not well-supported by her "mostly mild findings", "conservative course of care", Mr. B's "activities and admitted abilities", Mr. B's infrequent treatment visits", and his course of minimal medications. **(#19 at 14-15)**.

The Court agrees that the decision as to whether a claimant can work is reserved to the Commissioner, but that simply means that the conclusion, that the claimant cannot work, is excluded from the Commissioner's review. The underlying opinion of the claimant's limitations are not rejected; instead, they must be evaluated in the customary two-step analytical process to determine whether such findings (here, Dr. Lamberty's 2017 findings) are entitled to controlling weight.

The ALJ did not engage in this analysis, and consequently it constitutes legal error. Such error can be harmless, however, if discussion elsewhere in the Decision include reasons

16

sufficient to reject a treating physician's opinion or to give it less than controlling weight. When an ALJ rejects a treating physician's opinion, he/she must identify specific, good reasons for weight given to the opinion.   20 C.F.R. § 404.1527(d)(2).   This requires identification of specific evidence in the record that the ALJ found to be inconsistent with Dr. Lamberty's opinion, as well as demonstration that consistent evidence was considered.   *Id.*

As to the first inquiry—whether the opinion is supported by medically acceptable clinical and laboratory diagnostic techniques—the record is replete with instances where Dr. Shahkhan ordered objective medical testing such as MRIs and neuropsychological testing (conducted by Dr. Lamberty upon Dr. Shahkhan's referral).   From 2015 onward, the MRIs indicated worsening of Mr. B's MS.   For example, the 2015 MRI showed no "evidence for interval progression of disease" **(#13 at 426)** whereas the 2016 MRI showed a "stable mild to moderate supratentorial white matter **change**, compatible with multiple chronic demyelinating plaques; no suspicious enhancing lesions to suggest an active demyelinating process; and stable mild atrophy and mild T1 hypointense lesions load."[8]   **(#13 at 421) (emphasis added)**.   The April 2017 MRI showed "mild atrophy…stable mild to moderate scattered foci of non-enhancing increased T2 signal within the periventricular and subcortical white matter of both cerebral hemispheres."   **(#13 at 528)**.   The September 2018 MRI showed further progression of Mr. B's MS in that it revealed

---

[8]      MRIs have "become the single most useful test for the diagnosis of MS; MRI is sensitive to brain changes which are seen in MS. Classically, the MRI shows lesions in the white matter deep in the brain near the fluid spaces of the brain (the ventricles). The test may also show changes in the cortex or near the cortex. MRI can also show changes in the brainstem and in the spinal cord.   There may be a loss of brain or spinal cord volume, a change which is called atrophy."   https://my.clevelandclinic.org/health/articles/14315-multiple-sclerosis-frequently-asked-questions

"white matter of **both** cerebral hemispheres" and "development of a **new** 12 millimeter [brain] lesion".   **(#13 at 586, 588) (emphasis added)**.

The neuropsychological testing also showed a worsening of Mr. B's cognitive function consistent with symptoms of MS.   Dr. Lamberty conducted this testing in both 2015 and 2017. As previously detailed in this Opinion, Dr. Lamberty conducted an interview, examination, and a battery of tests measuring mental functions.   The 2015 testing showed decline in Mr. B's working memory and attention and impaired executive function.   He scored in the low average range in several areas (oral arithmetic skills, visual speed and sequencing) and was moderately impaired as to his divided attention and information processing speed.   **(#13 at 408)**.   During the testing, Mr. B displayed "very significant attention difficulties", "made a significant number of omission errors", and failed to respond to targets.   **(#13 at 408)**.   Further, Mr. B's reaction time was "extremely slow and variable" compared to a normal range and he struggled to perform as the tasks progressed.   **(#13 at 408)**.   Ultimately, Dr. Lamberty found Mr. B's performance to be "slow and inaccurate", indicating attention related deficits.   She stated that even when he responded to questions "very slowly", he was unable to "increase his accuracy."   **(#13 at 408-409)**.   The 2017 neuropsychological testing showed further cognitive decline.   During the testing, Dr. Lamberty observed Mr. B was "mildly disinhibited with frequent interruptions and swearing noted during formal testing.   He tended to be a bit distractible and required some repetition and clarification of instructions.   Response speed was slower than average."   **(#13 at 518-519)**.   The testing showed continued issues with information processing speed and working memory.   Mr. B scored in the low average range in an increased number of areas (visual sequencing, digit span and rapid color naming/word reading, upper extremity fine motor

18

dexterity/speed, phonemic fluency, immediate recall, and complex hypothesis task).   **(#13 at**

**519)**.   Based on the test results, Dr. Lamberty concluded Mr. B exhibited "further decline" since

the 2015 testing, and indicated Mr. B's "information processing speed, poor attention and

executive skills" would contribute to significant issues in his position [as an attorney]."   **(#13 at**

**520)**.   Dr. Lamberty further stated that "there has been a decline since his previous testing, and it

is anticipated that he will continue to experience further cognitive issues in the long run."   **(#13**

**at 520)**.

     These objective test results are consistent with Dr. Lamberty's observations during her

interviews and examinations of Mr. B in both 2015 and 2017.   **(#13 at 408-410, 1-7 at 339-345;**

**#11-10 at 612-638)**.   Like Dr. Lamberty, Dr. Shahkhan had concerns about Mr. B's cognitive

decline during office visits.   Indeed, it was Dr. Shahkhan who ordered the neuropsychological

testing that was conducted by Dr. Lamberty.   **(#13 at 407-412, 520)**.   Additionally, Dr.

Shahkhan agreed with Dr Lamberty's assessment that Mr. B was unable to continue his

employment as an attorney and supported the request for long-term disability benefits.   **(#13 at**

**406)**.   Thus, the Court finds Dr. Lamberty's opinions were supported by medically acceptable

clinical and laboratory diagnostic techniques.

     The Court now turns to the second inquiry—whether Dr. Lamberty's opinion is

inconsistent with the other substantial evidence in record.   The record contains another medical

opinion rendered by a consultative examiner, Robert Schuler, PhD., at the request of the SSA in

2016.   In August 2016, Dr. Schuler met with Mr. B and conducted a diagnostic interview and

administered the WAIS-IV test and the Wechsler Memory Scale-IV test.   **(# 13 at 337)**.   Dr.

Schuler's findings and objective test results were largely consistent with Dr. Lamberty's findings

even though he opined that Mr. B's limitations were less severe.   What is most telling as to this issue is that Dr. Schuler found that Mr. B's "performance on measures of learning and memory was significantly lower than a year ago".   **(#13 at 346)**.   As to Mr. B's ability to understand, remember and follow instructions, Dr. Schuler found he "displayed no difficulty in understanding and following instructions. However, his ability to spontaneously recall oral information such as that contained in the WMS-IV auditory memory tasks suggest mild limitation with scores falling between the 10th and 24th percentile when compared to the general population."   **(# 13 at 347)**.   As to the capacity to sustain attention and concentration, Dr. Schuler opined Mr. B had mild limitations.   As to carrying out tasks with reasonable persistence and pace, Dr. Schuler noted that Mr. B's test results showed "significantly weaker processing speed/efficiency skills when compared to estimates of premorbid functioning" and opined Mr. B had mild limitations as to simple, repetitive tasks and moderate limitations in "multitasking in complex situations", and "it will be important to consult with his physicians regarding barriers to his ability to persist at a competitive work pace."   **(#13 at 347)**.   Finally, Dr. Schuler opined that Mr. B had mild limitations in his ability to tolerate stress in an entry-level workplace but that work environments that were more complex would result in an increase of Mr. B's anxiety. **(#13 at 347)**.   Interestingly, the ALJ gave Dr. Schuler's opinions "minimal weight, as his findings were vague and tangential."   **(#13 at 51)**.   This probably was correct, in part because the opinions were fixed in 2016, and there is uncontroverted evidence of decline thereafter.

The record also contain opinions from nonexamining state agency consultants.   The ALJ's Decision gave "greater weight" to the agency consultant's opinions from the reconsideration level--that Mr. B has moderate limitations in the activities of understanding,

remembering, or applying information and concentrating, persisting, or maintaining pace.   (**#13 at 54**).   However, in this Circuit, "[t]he opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence."   *Singh*, 222 F.3d at 452.

Put simply, the record does not support the ALJ's stated reason for discrediting Dr. Lamberty's opinion—that it is conclusory and inconsistent with the evidence.   (**#13 at 53**).   Dr. Lamberty prepared two thorough reports and completed a "Behavioral Functional Ability" form. Also, the record is replete with evidence supporting Dr. Lamberty's opinion that Mr. B's cognitive function has declined, will likely continue to decline, and has caused extreme, marked, and/or moderate limitations in areas of mental functioning.[9]   Mr. B has consistently sought medical treatment for his MS and has undergone numerous MRIs and neuropsychological testing to measure the degree of his cognitive decline in the past few years.   His declining cognitive function is directly attributed to an objective finding—a diagnosis of relapsing/remitting MS. Dr. Lamberty's findings and opinions are substantiated by the neuropsychological testing data, her clinical observations, and MRI tests.   There is no evidence in the record to support the ALJ's RFC finding other than the non-treating consultants' assessments.   "These assessments alone cannot be considered substantial evidence in the face of the conflicting assessment of a treating

---

[9]     The SSA's regulations define a moderate limitation as an individual's "functioning in this area independently, appropriately, effectively, and on a sustained basis is *fair*."   In contrast, an extreme limitation means the *inability* to "function in this area independently, appropriately, effectively, and on a sustained basis", and a marked limited means an individuals' "functioning in this area independently, appropriately, effectively, and on a sustained basis is *seriously limited*."   20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.00(F)(2) (emphasis added).

physician." *Singh*, 222 F.3d at 452.   In sum, the ALJ's Decision fails to state specific and

legitimate reasons sufficient to conclude that Dr. Lamberty's opinion is inconsistent with

substantial evidence in the record[10].   As a consequence, her opinion is controlling and the failure

to adopt her functional limitations constitutes reversible error.   Even if not controlling,

insufficient justification is given for according little comparative weight to the opinion.

The Court finds the Decision's rejection of Dr. Lamberty's 2017 opinion contravenes

applicable legal standards and that the ALJ's RFC and disability conclusions at step three, four,

and five of the sequential analysis are not supported by substantial evidence.   Thus, the finding

that Mr. B is not disabled is reversed, and the matter is remanded for reconsideration on steps

three, four, and five of the sequential analysis, applying the proper legal standards to the opinion

of Dr. Lamberty and engaging specifically in a determination of whether her 2017 opinion is

entitled to controlling or deferential weight.   Thus, the Court need not reach Mr. B's other

specific claims of error in the ALJ's analysis.   The Court expresses no opinion as to the ultimate

determination of whether Mr. B is or should be found to be disabled.

## V.   CONCLUSION

For the foregoing reasons, the Plaintiff's motion for summary judgment (**#16**) is

**GRANTED**, and Defendant's motion for summary judgment (**#18**) is **DENIED**.   The

---

[10]     The Court also notes the Decision's internal inconsistency of giving great weight to Dr.
Lamberty's opinion that Mr. B could no longer work as an attorney due to his cognitive deficits
while completely disregarding her opinion that his cognitive impairments cause extreme,
marked, and moderate limitations affecting his ability to work at all.   This discrepancy is
unexplained and further undermines the ALJ's reasoning.   Indeed, as Mr. B points out in his
motion, the issue here is not whether he can perform the duties of an attorney, but whether he can
perform any work due to his cognitive impairments and worsening symptoms.   (**#17 at 21**).

Commissioner's decision is **REVERSED** and **REMANDED** for further proceedings consistent with this Opinion and Order.   Judgment shall enter in favor of Mr. B.

Dated this 11th day of March, 2021.

**BY THE COURT:**

Marcia S. Krieger
Senior United States District Judge